**STATEMENT OF FACTS**

***Carjacking and Robbery of C-1***

1.         On June 15, 2026 at approximately 10:03 PM, C-1 parked his BMW SUV (hereinafter, "VEHICLE-1") in the rear of his residence at ▮▮▮▮ (hereinafter "LOCATION-1") when he was approached by four subjects wearing dark clothing and dark face masks, three of whom were displaying firearms. Two of the armed subjects approached C-1 from the driver's side of VEHICLE-1 while a third approached from the passenger's side. The subjects pulled C-1 from VEHICLE-1 at gunpoint and forced him to the ground next to VEHICLE-1, out of view of the nearby security camera. All four subjects surrounded and/or manipulated C-1 while he was on the ground. C-1 was then forced into the rear passenger area of VEHICLE-1, which was driven away with three of the subjects inside. The fourth subject returned to the area of the suspect vehicle (hereinafter, "VEHICLE-2"), a gray sedan later identified as a 2013 Audi sedan bearing Virginia temporary registration ▮▮▮. VEHICLE-2 and VEHICLE-1 then travelled westbound through the rear alley away from LOCATION-1.



***Figure 1: Four subjects, circled in red, during the carjacking of C-1 behind LOCATION-1***

1

2.      When the subjects approached VEHICLE-1, C-1 was on the phone with a friend (hereinafter, "WITNESS-1"). WITNESS-1 heard C-1 say, "Please don't shoot. Take whatever you want" followed by an unknown subject saying, "I'm gonna shoot" before their call disconnected. WITNESS-1 attempted to call back WITNESS-1 but could not reach him again. WTINESS-1 called C-1's landlord (hereinafter, "WITNESS-2") to express concern for C-1. WITNESS-1 and WITNESS-2 then went to C-1's residence where WITNESS-2 found blood on the ground in C-1's assigned parking space, as well as C-1's wallet, beads from a bracelet, and a Croc-style clog shoe. WTINESS-2 called the Metropolitan Police Department (MPD) and officers were sent to LOCATION-1. A medical breach of C1's apartment was conducted and there were no obvious signs of foul play inside. Accordingly, MPD classified C-1 as a critically missing person.

3.      Subsequent to WITNESS-2 calling the police, WITNESS-1 received a call from C-1 who said he was having an emergency and asked WITNESS-1 to send $10,000 to ███████████ WITNESS-2 called WITNESS-3 for assistance and WITNESS-3 was ultimately instructed to pay $5,000 each to two different phone numbers: ███████ and ██████████. WITNESS-3 provided screenshots of both attempted transactions, which took place at 2:57 AM and 3:07 AM, respectively.



***Figure 2: Screenshots provided by WITNESS-3 containing attempted Apple Cash transfers***

4.      Due to C-1's critical missing status, MPD personnel submitted emergency disclosure requests (EDRs) to T-Mobile for historical and prospective records associated with C-1's cell phone and ▓▓▓▓▓▓▓▓ in an effort to locate C-1; your affiant believes MPD did not have information about the second transaction to ▓▓▓▓▓▓▓ at the time of this request. For the reasons discussed below, it is your affiant's assessment that C-1 was still in the custody of the suspects at the time of the above referenced transactions.

*Location of Subjects at 625 Hamlin Court NE*

5.      Analysis of cell site location information associated with C-1's device and the device identified by ▓▓▓▓▓▓▓ indicated the devices were likely co-located in the vicinity of LOCATION-1 shortly after 10:00 PM on June 15, 2026. At about 10:11 PM, the devices were co-located in the vicinity of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3

6.    In the early morning hours of June 16, 2026, MPD personnel tracked a device associated with ▬▬▬▬▬ to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (hereinafter, "LOCATION-2"). MPD officers knocked and announced their presence at the rear door of LOCATION-2 before breaching the exterior door. At the same time, three males and one female were seen running out the front door of LOCATION-2 and running upstairs to the third floor of the apartment building. The female was detained by law enforcement, but the males escaped to another unit inside the building. Inside LOCATION-2 in plain view of law enforcement was a significant amount of suspected marijuana and a black Glock pistol with an extended magazine on the kitchen countertop.

7.    A resident (hereinafter, "WITNESS-4") of ▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ (hereinafter, "LOCATION-3") later told MPD she was asleep in her apartment when she heard loud banging at her front door. WITNESS-4 looked through the peep hole of her door and recognized one of the suspects as the child of her friend. When she opened the door, four suspects pushed into her apartment and shut her door.[1] WITNESS-4 said she was too afraid to leave or notify police. One of the suspects asked WITNESS-4 to hide a bag inside of her residence.  WITNESS-4 advised law enforcement that she did not invite the suspects into her apartment and did not want them in the apartment unit.

8.    On the afternoon of June 16, 2026, MPD personnel obtained search warrants issued in the Superior Court of the District of Columbia for LOCATION-2 (▬▬▬▬▬▬▬▬) and LOCATION-3 (▬▬▬▬▬▬). Among the evidence seized from LOCATION-2 were the following items: Eight large laundry bags containing multiple vacuum-sealed bags of green

---

[1] A prior search warrant submitted in connection with this investigation incorrectly stated that Witness-4 advised three suspects entered her apartment.

leafy substance totaling approximately 76-78 pounds; a Glock 27 pistol with an obliterated serial number and a 22-round magazine inserted; a Taurus pistol with a 12-round magazine inserted; a Glock 23 handgun with a 22-round handgun inserted; a Glock 19 with an obliterated serial number and loaded with a 31-round magazine; additional magazines; multiple cellular phones; suspected drug paraphernalia; a pill bottle and a plastic bag containing blue pills; a plastic bag containing suspected crack cocaine; gray Jordan sneakers; black and blue Nike AirMax sneakers; two rounds of ammunition; armor plating; and a bag of baseball cards in plastic cases.

9.    Among the evidence sized from LOCATION-3 were the following items: Two cellular phones, dark gray Jordan sneakers, a black jacket with a hood, and a DTLR plastic bag with receipt. Also in LOCATION-3 were the following individuals who were placed under arrest for Burglary and transported for interview by MPD:

a.  Deonte Lane, ███████████████████

b.  Malik Wilkins, █████████████████████████

c.  Rogea Murray, ████████████████████

d.  Nelson Bryant, ███████████████████

*Victim Recovery and Statement*

10.    Later in the late afternoon on June 16, 2026, law enforcement made contact with C-1 in Silver Spring, MD. C-1 had visible injuries to his head, face, left eye, and right leg. C-1 told law enforcement he remembered parking his vehicle behind his residence the previous evening when he was suddenly approached by multiple subjects pointing guns at him. The subjects pulled C-1 out of his car, but ultimately put him back into the rear passenger compartment of it before driving it away with him inside. C-1 stated he remained inside of his own vehicle the entire time he was with the subjects and he believes they parked somewhere for an extended

period of time.  C-1 advised he was not released by the subjects until he saw the sun starting to rise.  Based on this statement, your affiant assesses that C-1 was in the custody of the suspects from the time he was kidnapped, through the burglary of C-1's business at 11:25 p.m., and when the payments to the suspects made by C-1's associate at 2:57 a.m. and 3:07 a.m., respectively.

11.    C-1 stated he did not know the people who robbed him and they did not ask him about other locations during the robbery. C-1 acknowledged he recently obtained a dispensary license and was working on opening a store. When law enforcement questioned him further about a secondary location and why he may have been targeted, C-1 called and attorney who ultimately invoked C-1's Fifth Amendment Rights on C-1's behalf. C-1 indicated he wished to speak with law enforcement and to provide a fulsome statement after consulting with the attorney.

### *Subject Identification and Additional Investigation*

12.    As described above, after the subjects forced C-1 into VEHICLE-1, VEHICLE-2 and VEHICLE-1 traveled away from LOCATION-1 through a rear alley. Both vehicles were then seen turning onto Adams Street NE and travelling westbound across 3rd Street NE. Surveillance footage from a nearby residence captured the front of VEHICLE-1, which displayed an Audi emblem on the grill.

13.    Analysis of the historical cellular records associated with phone number 443-769-2633 revealed that the device travelled from the vicinity of LOCATION-2 and LOCATION-3 to the Union Market area of Northeast Washington, DC at about 11:14 PM on June 15, 2026, just over an hour after the carjacking of C-1. The device arrived in the vicinity of Union Market around 11:20 PM and remained there for at least nine minutes. There were no available records for ▮▮▮ ▮▮▮▮▮ between 11:29 PM and 11:41 PM, at which time the device was back in the vicinity of LOCATION-2 and LOCATION-3. Review of MPD Crime Camera footage in the Union Market

6

area yielded video of VEHICLE-2, a gray 2013 Audi sedan bearing Virginia temporary tag 18102G, travelling northbound on 4th Street NE near the intersection of Neal Street NE at 11:33 PM. VEHICLE-2 is registered to NELSON BRYANT and was ultimately seized from the ███ ████████████████████████ on the afternoon of June 16, 2026.

14.     Additional surveillance footage of VEHICLE-2 in the Union Market area was obtained from the Morse Street Alley behind 1278 5th Street NE, Washington, DC (hereinafter, "LOCATION-4"). At approximately 11:22 PM on June 15, 2026, VEHICLE-2 arrived behind LOCATION-4. VEHICLE-2 traveled forward and in reverse multiple times behind LOCATION-4 before ultimately parking. Both front doors of the vehicle opened, but again closed as another sedan passed VEHICLE-2 in the alley. Your affiant assesses the occupants of VEHICLE-2 waited to exit until no one was in the alley.

15.     At approximately 11:25 PM, after the other vehicle was gone from camera view, the driver of VEHICLE-2 (a heavyset Black male wearing black sneakers, black sweatpants, a black jacket with reflective pocket trim and an emblem on the left breast over a white shirt, and a black skull cap) and the front passenger of VEHICLE-2 (a thin Black male with a light complexion wearing black sneakers, black sweatpants, a black Nike Tech jacket with gray accents, and a black face mask) got out of VEHICLE-2 and entered the rear of LOCATION-4. Over the next five minutes, the occupants of VEHICLE-2 loaded multiple large laundry-style bags into the rear passenger compartment and trunk of VEHICLE-2. Among the numerous bags with bright yellow and bright blue bags, which were later observed and seized by MPD inside of LOCATION-2.

16.     Of note, law enforcement obtained a Basic Business License for a corporation called "Mirage Inc." with C-1 listed as the billing party and LOCATION-4 listed as the premises,

which was issued on August 22, 2025. Based on statements made by C-1 and additional information obtained from the DC Alcoholic Beverage and Cannabis Administration (ABCA), your affiant believes LOCATION-4 is a marijuana dispensary that has not yet opened. Furthermore, your affiant assesses that at least two subjects involved in the carjacking of C-1 burglarized a closed commercial building associated with C-1 approximately one hour and twenty minutes after the carjacking.

17.     When DEONTE LANE was pulled from LOCATION-3, he was wearing the same clothing worn by the passenger of VEHICLE-2 during the burglary of LOCATION-4, as depicted in Figures 3 and 4 below. Based on similar clothing, building, complexion, and hairstyle, your affiant believes LANE is the passenger in VEHICLE-2 who participated in the burglary at LOCATION-4.

 

*Figure 3: MPD body-worn camera (BWC) depicting LANE after his arrest at LOCATION-3*



*Figure 4: Surveillance footage from Morse Street Alley during the burglary of LOCATION-4 on June 15, 2026*

18.    Furthermore, your affiant believes NELSON BRYANT was the driver of VEHICLE-2 and participated in the burglary of LOCATION-4 with LANE, as well as the carjacking and subsequent kidnapping of C-1 at LOCATION-1. BRYANT is the registered owner of VEHICLE-2 and believed to be the user of the cell phone associated with ▮▮▮▮▮▮ one of the two numbers to which C-1 asked for money to be sent. While no subscriber name or address was associated with ▮▮▮▮▮▮ in T-Mobile records, analysis of call detail records associated with the number indicate the user was in contact with multiple other numbers attributed to associates of BRYANT, including an immediate family member with a common address in Waldorf, Maryland listed in law enforcement databases.

19.    Historical records associated with ▮▮▮▮▮▮ obtained pursuant to MPD's EDR to T-Mobile not only indicate the device was in the vicinity of LOCATION-1 during the carjacking of C-1, but it was also in the vicinity of LOCATION-4 during the burglary of C-1's business. Furthermore, the records are consistent with the device travelling on June 14, 2026 to

9

the vicinity of the aforementioned address in Waldorf, Maryland, which is likewise the address at which VEHICLE-2 is registered in BRYANT's name.

20. The driver of VEHICLE-2 who participated in the burglary of LOCATION-4 can be seen on surveillance video wearing black sneakers, black sweatpants, a black jacket with reflective pocket trim and an emblem on the left breast over a white shirt, and a black skull cap. When his uncovered face is briefly revealed to the nearby security camera, he appears to have a dark complexion and dark facial hair. His physical build, complexion, and facial hair are consistent with that of BRYANT, who was arrested at LOCATION-3. Your affiant believes BRYANT drove his own car, VEHICLE-2, during the burglary of LOCATION-4.



*Figure 5: Still from MPD BWC depicting BRYANT after his arrest at LOCATION-3 (left) and stills of the driver of VEHICLE-2 during the burglary at LOCATION-4 (middle, right)*

21. In addition to BRYANT's contacts referenced above, the call detail records associated with ███████ include multiple calls with ███████ during the commission of the TARGET OFFENSES. Cellular telephone number ███████ is associated with

10

MALIK WILKINS, another subject arrested at LOCATION-3 on June 16, 2026, in multiple opensource databases. The device associated with BRYANT called the device associated with WILKINS at 6:19 PM on June 16, 2026 prior to the TARGET OFFENSES. The device associated with WILKINS then called the device associated with BRYANT twice at 10:09 PM and 10:11 PM respectfully, shortly after VEHICLE-1 and VEHICLE-2 would have left the rear alley of LOCATION-1 following the carjacking. The device associated with WILKINS called the device associated with BRYANT again at 11:17 PM, during which time BRYANT would have been travelling to LOCATION-4. Your affiant believes BRYANT and WILKINS communicated by phone during the commission and in the furtherance of the TARGET OFFENSES.

22.    The second phone number to which WITNESS-3 sent money, ████████, is attributed to ROGEL MURRAY in law enforcement databases. Also in law enforcement holdings, ROGEL MURRAY's listed address is ████████████, a building on the same block as LOCATION-2 and LOCATION-3. Your affiant believes ROGEL MURRAY is a biological relative of ROGEA MURRAY, one of the subjects arrested inside of LOCATION-3.

23.    Two pairs of shoes seized from LOCATION-2 are consistent with pairs worn by two of the subjects who participated in the carjacking of C-1 at LOCATION-1. One pair, gray high-top sneakers with a white sole, are depicted in Figure 6 below. A second pair, black Nike AirMax sneakers with a reflective tongue and gel heel, are depicted in Figure 7. Both pairs of shoes are different than those worn by LANE during the burglary of LOCATION-4 and his subsequent arrest at LOCATION-3.  These shoes are also different than those BRYANT was arrested wearing and wore during the burglary of LOCATION-4.



*Figure 6: Surveillance footage at LOCATION-1 (left) depicting one subject wearing gray high-top sneakers with white soles (left) and similar shoes seized from LOCATION-2 (right)*



*Figure 7: Surveillance footage at LOCATION-1 (left) depicting one subject black Nike AirMax sneakers with a reflective tongue and gel heel (left) and similar shoes seized from LOCATION-2 (right)*

24.     Your affiant anticipates additional investigative action including, but not limited to, multiple searches of cars and physical property, multiple searches for additional cell site location information, multiple additional interviews, and video canvass efforts. Your affiant expects the evidence obtained pursuant to these efforts will yield additional information about the specific roles each subject, known or unknown, played in the violent carjacking, kidnapping, and robbery of C-1.

**Probable Cause**

25.     With the evidence currently available, your affiant believes there is probable cause that BRYANT participated in the violent carjacking and kidnapping of C-1 and the subsequent burglary of a commercial property tied to C-1.  This is based on historical cell site information for a number associated with BRYANT placing the device at the scene of the carjacking and kidnapping of C-1, as well as at the scene of the burglary of a commercial property tied to C-1. Additionally, BRYANT was captured at the scene of the burglary entering and exiting VEHICLE-2, the vehicle that was used to facilitate the carjacking and kidnapping of C-1.  Furthermore, for the reasons discussed above, your affiant assesses that C-1 was in the custody of the suspects during the burglary of his commercial property.  Accordingly, your affiant submits that there is probable cause to find that BRYANT committed violations of 18 U.S.C. §§ 2119 and 2 (Carjacking and Aiding and Abetting); 18 U.S.C. §§ 1201 and 2 (Kidnapping and Aiding and Abetting); 18 U.S.C. §§ 1951 and 2 (Hobbs Act Robbery and Aiding and Abetting); and 22 D.C. Code § 3302(a)(1) (unlawful entry).

26.      Based on the evidence currently available, your affiant believes there is probable cause that LANE at a minimum, participated in the burglary of a commercial property tied to C-1, while C-1 was in the custody of the suspects, and therefore committed a violation of 18 U.S.C. §§ 1951, 2 (Hobbs Act Robbery and Aiding and Abetting).  LANE was arrested wearing clothing consistent with that worn by the second suspect who was captured on surveillance video at the scene of the burglary of the commercial property tied to C-1.  That suspect, who your affiant submits is LANE, was captured on video exiting and entering VEHICLE-2, which was used in the commission of the carjacking and kidnapping of C-1., during the burglary of the commercial property. Surveillance video also captured LANE loading multiple large laundry-style bags into the rear passenger compartment and trunk of VEHICLE-2. Among the numerous bags with bright yellow and bright blue bags, which were later observed and seized by MPD inside of LOCATION-2.  Based on the evidence currently available, your affiant believes there is probable cause that LANE participated in the burglary of a commercial property tied to C-1, while C-1 was in the custody of the suspects, and therefore committed a violation of 18 U.S.C. §§ 1951, 2 (Hobbs Act Robbery and Aiding and Abetting).  Accordingly, based on the information provided above, your affiant submits that there is probable cause to find that LANE committed violations of 18 U.S.C. §§ 1951, and 2 (Hobbs Act Robbery and Aiding and Abetting); and 22 D.C. Code § 3302(a)(1) (unlawful entry).

27.      Additionally, based on the evidence currently available, your affiant believes there is probable cause that WILKINS conspired to commit violations of 18 U.S.C. §§ 2119 and 2 (Carjacking and Aiding and Abetting); 18 U.S.C. §§ 1201 and 2 (Kidnapping and Aiding and Abetting); 18 U.S.C. §§ 1951 and 2 (Hobbs Act Robbery and Aiding and Abetting); and 22 D.C. Code § 3302(a)(1) (unlawful entry).  As discussed above, the device associated with BRYANT

14

called the device associated with WILKINS at 6:19 PM on June 16, 2026, prior to the TARGET OFFENSES. The device associated with WILKINS then called the device associated with BRYANT twice at 10:09 PM and 10:11 PM respectfully, shortly after VEHICLE-1 and VEHICLE-2 would have left the rear alley of LOCATION-1 following the carjacking. The device associated with WILKINS called the device associated with BRYANT again at 11:17 PM, during which time BRYANT would have been travelling to LOCATION-4. Your affiant believes BRYANT and WILKINS communicated by phone during the commission and in furtherance of the TARGET OFFENSES. WILKINS was arrested with BRYANT following their flight from LOCATION-2 on June 16, 2026.

28.     The second phone number to which WITNESS-3 sent money, ███████████ is attributed to ROGEL MURRAY in law enforcement databases. Also in law enforcement holdings, ROGEL MURRAY's listed address is ███████████████ a building on the same block as LOCATION-2 and LOCATION-3. Your affiant believes ROGEL MURRAY is a biological relative of ROGEA MURRAY, one of the subjects arrested inside of LOCATION-3. Furthermore, ROGEA MURRAY was present in LOCATION-2 where items stolen during the burglary of C-1's business were later found and fled with his co-defendants from LOCATION-2 to LOCATION-3.

29.     Your affiant submits that WILKINS and MURRAY fled from LOCATION-2 when law enforcement arrived at the location where BRYANT'S phone number was last located. Inside of LOCATION-2 were four firearms and the proceeds from the burglary of the commercial establishment associated with C-1. Also, inside of LOCATION-2 were two pairs of shoes consistent with those worn by suspects involved in the carjacking and kidnapping of C-1. Those shoes were different than the shoes worn by LANE during the burglary of the commercial

establishment associated with C-1.  Furthermore, for the reasons discussed above, your affiant assesses that C-1 was in custody of the suspects during the burglary of his commercial property. Accordingly, your affiant submits that there is probable cause to find that WILKINS and MURRAY committed violations of 18 U.S.C. §§ 1951, and 2 (Hobbs Act Robbery and Aiding and Abetting); and 22 D.C. Code § 3302(a)(1) (Unlawful Entry).

Emily Cahill
Special Agent
Federal Bureau of Investigation

Subscribed and sworn by telephone pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 18, 2026.

Honorable Matthew J. Sharbaugh
United States Magistrate Judge